**233 P.2d 829**
**HUDDLESTON v. INDUSTRIAL COMMISSION et al.**

**No. 5368.**

Supreme Court of Arizona.

July 13, 1951.

Marvin Johnson, Phoenix, for petitioner.

Donald J. Morgan, Phoenix, H. S. McCluskey and Donald J. Morgan, Phoenix, of counsel, for respondent Industrial Commission.

LA PRADE, Justice.

This proceeding is by certiorari prosecuted at the instance of Elmer Huddleston, Petitioner, to review an amended award of the Industrial Commission of Arizona.

It appears that the petitioner was employed by the respondent, Beulah Anderson, dba Anderson Boarding & Supply Company, as a dishwasher. On the 14th day of September, 1946, petitioner suffered injury by accident arising out of and in the course of his employment with the respondent employer.

The first report of the attending physician shows that as a result of the accident, petitioner was in a state of shock and suffered internal injuries which produced blood in the urine. In addition to these injuries, he had five ribs fractured, comminuted fracture of the left clavicle, mulitiple abrasions and contusion of the left shoulder, arm and both legs. On October 18, 1946, petitioner was released from the hospital in Tucson and sent to Phoenix for "observation-supportive and tonic medication". At the time of the accident and resulting injuries, petitioner was 69 years and 7 months of age. The report of the attending physician filed with the commission on November 1, 1946, contained a notation that normal recovery would be delayed "because of the age of the patient and he does not look robust". The next medical report was filed December 30, 1946, and stated that the petitioner could not return to work and that there would be some permanent disability, and further "Patient is co-operating as much as he can. He develops colds and coughs much at night and has a generally hard time. Might

be necessary to hospitalize him because of his general condition."

A medical report filed later, to-wit, February 10, 1947, was to the effect that the patient had not recovered, that he was unable to work and that his disability was total, and carried the following notation: "No new complications but just does not get well and has numerous complaints. I do not believe that he is able to work. Request a consultation board and request that some internist be on the board. * * * This is an old man 69 years old and he was quite severely injured and I do not believe that he is able to do anything but the lightest work."

In March, 1947, Huddleston was referred to a medical board which board reported that he had recovered from his injuries and that his condition had become stationary so far as the injuries were concerned, and that he had sustained a 25% general physical functional disability attributable to the injuries sustained. By way of comment, the report contained the following information: "In reviewing this case and considering the cause of disability, we are of the opinion that the principal factors are his age and the effect of chronic alcoholism; to a less extent his disability can be attributed to the injuries in the accident of September 14, 1946. * * * Further treatments or examinations for the above injuries are not indicated. Because of his age, poor general physical

condition and history of chronic overindulgence of alcohol, he may require care and observation but this is in no way connected with the accident in question."

On May 7, 1947, the commission made its findings and an award granting petitioner compensation for *total permanent* disability. In addition to the jurisdictional facts, the commission found that his average monthly wage was $276.00 a month, and fixed his compensation at $179.40, being 65% of his average monthly wage (sec. 56–956, A.C.A.1939). Respondent-employer seasonably filed an application for rehearing, challenging the findings: (1) that the average monthly wage was $276.00; (2) that the employee had sustained a total permanent disability. A rehearing was granted, at which time witnesses were sworn and evidence adduced. On August 11, 1947, the commission reaffirmed the jurisdictional findings, including the finding that his average monthly wage was $276.00, but modified the finding that he had suffered *total permanent* disability and found that he had sustained a *permanent partial* disability, compensable under section 56–957, subsection (c), A.C.A.1939, as an unscheduled injury, and further found that applicant was entitled to compensation equal to 55% of the difference between his average monthly wages before the accident and what he might be able to earn thereafter. He was instructed to endeavor to find employment and report his monthly earnings to the commission. Thereafter, the commission paid him $151.80 per month, being an amount equal to 55% of his average monthly wage, with no earning power. Nearly two years went by without any report of earnings by petitioner, and it was discovered that he had done no work and had been hospitalized for conditions other than the result of his injuries. On November 30, 1949, an order to show cause was issued by the commission, directed to the petitioner, commanding him to appear and show cause, if any, why a final award should not be made and to establish his true loss of earning power resulting from the accident and attendant injuries. At the hearing upon this order to show cause, petitioner testified that he was totally unable to work, that he suffered from nervousness, the shakes, shooting pains in knees and shoulders and back of head, and that he could neither stand nor sit up for any length of time. A registered nurse by the name of Edith De Graw testified that she had had occasion to observe him for the previous two and one-half years (date of this hearing January 20, 1950), and that petitioner always complained of pains in the head, shoulder and arm and of constant amnesia due to his pain. She further testified that in her judgment he was not able to do any work due to his general physical condition, limitation of motion of shoulder and loss of memory; that he was feeble and walked unsteadily. In her examination by the referee, the following questions and answers appear of record:

"Q. Do you think some of his present condition might be attributable to senility rather than to any sequela of an accident wherein he injured his shoulder and head and ribs, or would they be overlapping? A. I don't think you could separate the two, I couldn't; I am not a doctor.

"Q. Isn't it common experience that a man of his years with this previous history who has had infection for many years would be in poorer physical condition than a young man who suffered the same accident? A. That is right, but I feel that you are questioning the case that his age might be a penalty. He was old when it happened and such a severe accident in my opinion couldn't lengthen his life span or the senile changes, it would seem to me they would be hastened by such an accident."

Mrs. Margaret Miners, landlady of petitioner, testified that he had been living at her rooming house for approximately two years; that she had had occasion to observe him every day; that in her judgment he was not robust and was unable to do any work; that she had asked him one time to wash her dishes and discovered that he was not able to do it due to his nervousness; and that he coughed a great deal at night and during his waking hours was unable to sit still for any length of time.

In addition to this testimony, Dr. Mc-Grath, a recognized neurologist and psychiatrist, testified that over a period of months he had treated petitioner and that he last examined him on February 1, 1950, the date of his giving the testimony being February 3, 1950. His testimony was to the effect that he found petitioner exceedingly tense and tremulous, exhibiting a marked startled reaction and some incoordination in his movements; that petitioner suffered a cerebral abnormality which he felt the prior consultants overlooked; that he considered him able to do some restricted forms of light work such as dishwashing on a part-time basis for perhaps half days. Further elaborating upon this aspect of the matter, he testified:

"The disability of itself is rather a general nature at this time and is of such a kind as to render him likely to be unable to continue more than an hour or so, or perhaps four hours at the most without development of sufficient nervousness to make it impossible for him to do ordinary work. That is his threshold, I think, or tolerance for continuing work, even of a mechanical nature, that is probably restricted by his general nervous condition. I do find a restriction in the strength of his freeness of movement of his left upper extremity, and that should be taken into consideration when we define what type of light work.

"Q. Does that man have any central involvement of his central nervous system. That is to say, of his brain, of his cerebrum, anything that might be a result of trauma?

A. He has central nervous damage, its damage I have not determined."

This witness was asked to examine all of the medical reports and X-ray findings in the entire file. To support his conclusion that petitioner suffered a cerebral abnormality, he pointed to the fact that the report of Dr. Dixon, the first attending physician, under date of December 6, 1946, stated: "The patient sustained a concussion of the brain, multiple lacerations and abrasions, and remained in serious condition because of a brain injury."

The testimony of petitioner, the nurse, the landlady, and that of Dr. McGrath constituted *all* the testimony offered upon the hearing on the order to show cause. No attempt was made by the respondent-employer or the commission to offer any evidence to show that there had been any change in petitioner's physical condition or earning capacity subsequent to the award of May 7, 1947, wherein it was determined that he should receive 55% of the difference between his average monthly wage at the time of the injury and what he was able to earn thereafter. The record definitely discloses that he had not been able to earn anything up until the date of this last hearing wherein it was determined that the applicant was entitled to permanent compensation in the sum of $45.54 per month. It was not spelled out in the award but was equivalent to saying that he had suffered a 30% loss in his earning power, meaning that his earning power was $193.20 per month. The difference between this latter sum and $276.00 is $82.80, representing the difference in earning power. 55% of this latter amount equals $45.54, being the award that was made and which is under challenge on this review.

The commission, by its final award, recognizes that the petitioner has suffered some loss of earning power attributable to the injuries received in the accident. The duty of determining this loss of earning power rests upon the commission. Matlock v. Industrial Commission, 70 Ariz. 25, 215 P.2d 612. Any finding of fact in this behalf must be based upon evidence. Six companies, Inc. v. Ind. Com., 41 Ariz, 366, 18 P.2d 913. The showing made by the applicant on the order to show cause rather convincingly demonstrates that he was neither physically nor mentally capable of doing any remunerative work. No positive showing was made nor any facts developed from which it might be inferred that his failure to be engaged in some gainful occupation is not due to his partial disability, resulting from the injuries sustained. Nowhere in this record is it demonstrated, or reasonably inferable that petitioner can earn $193.20 per month.

There being no evidence to sustain the findings and award which are in effect that petitioner has sustained only a 30% loss in earning capacity, the award must be set aside, and it is so ordered.

UDALL, C. J., and STANFORD and DE CONCINI, JJ., concurring.

274

PHELPS, Justice (specially concurring).

It is with reluctance that I am compelled to concur in the majority opinion because I find nothing in the evidence presented at the hearing in 1950 that would indicate that petitioner's 50% disability testified to by Dr. McGrath (called as a witness by petitioner) was not due to the infirmities of old age rather than to the injuries sustained by petitioner in 1946. Dr. McGrath declined to testify that such disability was due to injuries sustained at that time. The most he would admit was that *it could be* a result of such injuries.

Regardless of this fact, however, there was no competent evidence adduced at the hearing upon which the commission could base its finding that petitioner was then capable of earning $193.20 per month. For this reason the award should be set aside.